IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                 CRIMINAL ACTION NO. 2:20-cr-00096

JODY LEE BUSKIRK,

        Defendant.

**MEMORANDUM OPINION AND ORDER**

The Court has reviewed the *Defendant's Motion to Suppress Evidence* (Document 38) and *Memorandum in Support of Defendant's Motion to Suppress Evidence* (Document 39), the *United States' Response to Defendant's Pretrial Motions* (Document 47), and the *United States' Brief in Opposition to Defendant's Motion to Suppress Evidence* (Document 48). For the reasons stated herein, the Court finds that the Defendant's motion to suppress evidence should be granted.

**FACTUAL AND PROCEDURAL BACKGROUND**[1]

On February 3, 2020, the Jackson County Sheriff's Office received a call about a "heated argument" between a male and a female at a house located at 45 Langley Road in Sandyville, Jackson County, West Virginia. Deputy Varney and Deputy L.M. Casto responded to the scene in uniform and in marked police cruisers. Responding to such calls in pairs is consistent with training protocol.

---

[1] The facts are largely undisputed, and because suppression is appropriate accepting the United States' version of events, no hearing is necessary to resolve any factual disputes.

Deputy Varney approached first without his lights or sirens activated and parked in a manner that blocked vehicles in the driveway. Deputy Varney noticed a red pickup truck in the driveway with a man, later identified as Mr. Buskirk, the Defendant, seated in the driver's seat and a female standing nearby. The United States does not dispute the fact that the Defendant had driven the truck to the location on Langley Road on February 3, 2020 (as set forth in the Defendant's motion). Deputy Varney approached and explained that they received a call regarding an argument. The "female, later identified as Beverly Archer, simply gave Deputy Varney a look that indicated to him that she had in fact been involved in such an argument." (Document 48 at 3.) Deputy Varney then separated Ms. Archer from Mr. Buskirk.

Deputy Casto arrived shortly thereafter, without using his lights or siren. He parked near the mouth of the driveway along Langley Road. Deputy Casto engaged the Defendant in small talk, attempting to keep him calm. According to the deputies, if they determined that no physical abuse had occurred, they simply intended to ask the non-resident to leave for the night, provide assistance and advise both parties about how to obtain domestic violence protection orders.

The Defendant "attempted on three occasions to turn away from Deputy Casto and walk toward the truck. The driver's door of the truck remained open during this period of time."[2] (Document 48 at 5.) On the first two occasions, Deputy Casto ordered the Defendant to stay put. On the third occasion, Deputy Casto grabbed the Defendant and placed him in handcuffs. Deputy Casto stated that he did so for "safety reasons" because the truck and the house had not been searched for weapons. Additionally, Deputy Casto stated that he placed the Defendant in

---

2 The Defendant's version of facts is that he asked to use the restroom three times, and on the third time Deputy Casto raised his voice, said no, and placed the Defendant in handcuffs in the police cruiser. The Court notes that this difference in facts does not change the analysis but accepts the Government's version of the facts as true for purposes of this motion.

2

handcuffs because he was "displaying mannerisms that Deputy Casto felt were consisted with a 'fight or flight' response and felt that he was either going to attempt to run or become violent." (*Id.*)

After the Defendant was handcuffed, the deputies determined that his license was suspended. They then "discussed the Defendant's apparent desire to access the truck and resolved to utilize Deputy Varney's canine partner on the truck." (Document 48 at 6.) Before the canine was actually employed to search the vehicle and while he was handcuffed, the Defendant stated that there would be a "bubble of methamphetamine" in the vehicle. (*Id.*) Deputy Varney proceeded to deploy his canine and got a positive indication, after which, the deputies searched the truck and discovered both a small pipe containing suspected methamphetamine and a .22 caliber semi-automatic pistol.

The deputies discovered that the serial number on the firearm had been altered. They then asked the Defendant if he was a felon. At some point after the Defendant was detained, Ms. Archer stated that she was afraid that the Defendant would have killed her if she gave a statement against him. After all of these events, the Defendant was mirandized and interviewed by Deputy Casto. During the interview, he admitted to receiving the firearm from Ms. Archer and concealing it in his truck as the deputies approached. The deputies checked the registration plate on the truck and determined that the vehicle registration had been suspended for several years.

The Defendant was then transported to the Jackson County Sheriff's Office and Deputy Varney requested a tow truck to tow the pickup truck associated with the Defendant. While in route to the Sheriff's Office, the Defendant stated that the firearm belonged to his son.

3

On June 23, 2020, an Indictment was filed charging the Defendant with being a Felon in Possession of a Firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). On September 21, 2020, the Defendant filed a motion to suppress evidence. On September 28, 2020, the United States filed a response in opposition to the motion to suppress. The motion is ripe for consideration.

## DISCUSSION

The Defendant argues that he had a reasonable expectation of privacy in the truck, and therefore, has standing to challenge the unlawful search. He also argues that unlawful seizures occurred when the deputies blocked his vehicle with their patrol cars and when he was handcuffed because the officers had no reasonable suspicion of illegal conduct. Moreover, the Defendant argues that no exigent circumstances justified the seizure.

The United States argues that Mr. Buskirk did not have a reasonable expectation of privacy in Ms. Archer's home or its curtilage, and therefore, the Defendant lacks standing to challenge the search based on Fourth Amendment protections.[3] It argues that a *Terry* stop was warranted, because there was a reasonable, articulable suspicion that Mr. Buskirk either committed or was about to commit a crime. In particular, the United States argues that the seizure was warranted because "officers had confirmed that the two parties were indeed involved in a verbal altercation." (Document 48 at 23.) Last, the United States argues that the inevitable discovery doctrine applies, because officers would have discerned that Mr. Buskirk's license was suspended and the vehicle's registration was expired, so the evidence would have been discovered when the vehicle was towed.

---

3 The United States discussed at length the Defendant's expectation of privacy in the home and its curtilage. That body of law is not particularly applicable to the facts presented here, so the Court will not address those arguments. It is undisputed that the Defendant drove the truck to the home on February 3, 2020. Clearly, he had an expectation of privacy in the truck.

4

The Fourth Amendment to the Constitution prohibits unreasonable searches and seizures. U.S. Const. amend. IV. Under the Fourth Amendment, police officers may approach individuals in public places and ask them questions, "so long as a reasonable person would understand that he or she could refuse to cooperate." *Florida v. Bostick*, 501 U.S. 429, 431 (1991). Under those circumstances, the police encounter is "consensual and no reasonable suspicion is required." *Id.* at 434.

A seizure occurs, however, once a reasonable person would no longer believe he or she is free "to disregard the police and go about their business." *Id.* at 433 (quoting *California v. Hodari D.*, 499 U.S. 621, 269 (1991)). The test is whether "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (plurality op.).

> A court considers a number of factors in determining whether an officer's conduct would convey to a reasonable person that he is not free to leave. These include, but are not limited to, the number of police officers present during the encounter, whether they were in uniform or displayed their weapons, whether they touched the defendant, whether they attempted to block his departure or retrain his movement, whether the officers' questioning was non-threatening, and whether they treated the defendant as though they suspected him of illegal activity rather than treating the encounter as routine in nature.

*United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012) (quoting *United States v. Gray*, 883 F.2s 320, 322−23 (4th Cir. 1989)).

Once an encounter is no longer consensual, it triggers Fourth Amendment scrutiny. *United States v. Wilson*, 953 F.2d 116, 121 (4th Cir. 1991). "Police-citizen encounters that are consensual require no justification, but those that are not consensual impose a detention on a citizen and so must be supported by an officer's reasonable, articulable suspicion" that a person is engaged

5

in criminal activity. *United States v. Jones*, 678 F.3d 293, 299 (4th Cir. 2012). The reasonable suspicion "must be based on specific, objective facts, an inchoate and unparticularized suspicion or hunch will not suffice." *United States v. Williams*, 615 F.3d 657, 666 (6th Cir. 2010) (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979) and *Terry v. Ohio*, 392 U.S. 1, 27 (1968)) (internal quotation marks and citations omitted). The totality of the circumstances must be considered to determine whether an officer had reasonable suspicion. *United States v. Arvizu*, 534 U.S. 266, 274 (2002). Without such reasonable suspicion, seizure is unlawful, and any evidence seized may not be used by the government. *United States v. Bullette*, 854 F.3d 261, 265 (4th Cir. 2017).

In this case, the Defendant was arguably detained when Deputy Casto ordered him to "stay put," but he was clearly detained at the moment that Deputy Casto placed him in handcuffs.[4] Therefore, for the Defendant's seizure to have been lawful, there must have been some reasonable articulable suspicion, at that time, that the Defendant was engaged in illegal conduct. The deputies were called to the scene to investigate a "heated argument." Assuming the facts presented by the United States to be accurate, there was nothing in the call about domestic violence or violation of any other law.

Moreover, when the deputies arrived at the scene, they observed nothing to indicate that any violence or threats had occurred. The Defendant was seated inside his truck and Ms. Archer was standing outside the truck some distance away. Instead, the deputies appear to have relied entirely on a "look" from Ms. Archer that she had, in fact, been engaged in an "argument" to trigger their suspicion of illegal conduct.[5] The Court finds that an officer's interpretation of such

---

4 There is also a question about whether Mr. Buskirk was detained at the moment that the officers parked their car in a manner that blocked him in. However, the Court finds it unnecessary to delve into that inquiry given the subsequent obvious seizure of Mr. Buskirk.
5 The Court finds it important that the officers merely confirmed that an "argument" had occurred based on Ms.

6

a "look" is nothing more than an inchoate and unparticularized suspicion or hunch that cannot serve as the basis for reasonable articulable suspicion of criminal conduct. The call that prompted the deputies' appearance only referenced a heated argument and the Fourth Amendment simply does not permit detention without reasonable suspicion of a crime.[6]

Next, to justify handcuffing the Defendant, Deputy Casto stated that the Defendant "attempted on three occasions to turn away from Deputy Casto and walk towards the truck" and was "displaying mannerisms that Deputy Casto felt were consisted with a 'fight or flight' response and felt that he was either going to attempt to run or become violent." (Document 48 at 5.) However, the Defendant was, in fact, free to walk away, and the deputies had no legal basis to prevent him from doing so because, at that point, there was still no reasonable articulable basis for suspecting illegal conduct. Relying on uncharacterized "mannerisms" to justify a detention based on officer safety is also insufficiently vague.

Finally, the United States, invoking the inevitable discovery doctrine, argues that the seized evidence would have ultimately been discovered. Unlawfully seized evidence may be used pursuant to the inevitable-discovery doctrine, which "allows the government to use information obtained from an otherwise unreasonable search if it can establish by a preponderance of the evidence that law enforcement would have 'ultimately or inevitably' discovered the evidence by 'lawful means.'" *Id.* For example, "[a]n inventory search of an automobile is lawful (1) where the circumstances reasonably justified seizure or impoundment, and (2) law enforcement conducts the inventory search according to routine and standard procedures designed to secure the vehicle

---

Archer's "look." There was no indication that any type of more aggressive encounter had occurred. It is not quite clear to the Court what precise facial expression conveys "I have indeed been involved in a heated argument."
6 Police procedures for handling disputes do not carry more weight than constitutional parameters for detaining individuals.

or its contents." *Id.* However, "an inventory search policy must restrict discretion in order to tether inventory searches to their permissible purposes and prevent them from becoming 'a ruse for general rummaging in order to discover incriminating evidence.'" *United States v. Seay*, 944 F.3d 220, 223 (4th Cir. 2019). "[T]he premise of the inevitable discovery doctrine is that the illegal search played no real part in discovery of incriminating evidence." *United States v. Thomas*, 955 F.2d 207, 209 (4th Cir. 1992).

The United States argues that officers would have asked the Defendant to leave the scene if no evidence of a physical altercation or other crime was discovered. They further assert that the officers would have checked the Defendant's license and vehicle registration at that time, during which the officers would have discovered that they had both expired. As a result, they argue, the officers would have called a tow truck and then taken inventory of the vehicle prior to towing it.

Accepting the United States' facts as true, there are several contingent steps which would have had to occur before the officers would get to the search of the vehicle. First, without evidence of a crime having been committed, it is not clear that the Defendant's license and registration would have been checked. Further, the United States acknowledges that Ms. Archer had the discretion to decide whether to tow the vehicle, since she was the property owner. It is clearly not inevitable, however, that Ms. Archer would have wanted the vehicle towed. In fact, in the actual scenario, Ms. Archer called the tow truck off. If she had not wanted the vehicle towed, there would have been no grounds for a search of the vehicle. Thus, it is at least equally as likely that the vehicle inventory search would never have occurred, and no evidence would have

been discovered. Therefore, the Court finds that the inevitable-discovery doctrine does not apply to the evidence seized given the facts presented here.

Accordingly, the Court finds that there was no reasonable articulable suspicion of criminal conduct based on specific, objective facts, and that, therefore, the seizure and detention were unlawful. The physical evidence seized as a result of the encounter and the Defendant's statements made after he was unlawfully detained must be suppressed.

## CONCLUSION

WHEREFORE, after thorough review and careful consideration, the Court **ORDERS** that the *Defendant's Motion to Suppress Evidence* (Document 38) be **GRANTED** and all evidence obtained following the unlawful detention, including the statements and items seized during the vehicle search, shall be suppressed.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, to the United States Attorney, to the United States Probation Office, and to the Office of the United States Marshal.

ENTER: October 2, 2020

IRENE C. BERGER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF WEST VIRGINIA